FILED

13 SEP 19 PM 3: 26

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

1    TODD M LANDER (BAR NO. 173031)
     todd.lander@ffslaw.com
2    JOHN D. VAN ACKEREN (BAR NO. 240739)
     john.vanackeren@ffslaw.com
3    FREEMAN, FREEMAN & SMILEY, LLP
     1888 Century Park East, Suite 1900
4    Los Angeles, California 90067
     Telephone:  (310) 255-6100
5    Facsimile:  (310) 255-6200

6    Attorneys for GEMCAP LENDING I,
     LLC

7

8                  UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11   GEMCAP LENDING I, LLC, a           Case No.  CV13-6951 JFW (RZx)
     Delaware limited liability company,
12                                       COMPLAINT FOR:
                  Plaintiff,             (1)  CIVIL RICO VIOLATIONS
13                                       (2)  BREACH OF LOAN
            vs.                               AGREEMENT
14                                       (3)  BREACH OF GUARANTY
     WESTERN FOODS DISTRIBUTION,         (4)  FRAUD
15   a Nevada limited liability company, (5)  NEGLIGENCE
     JOHN MASE, an individual, JERRY A.  (6)  NEGLIGENCE
16   BROWN, an individual, FAINSBERT,    (7)  CONVERSION
     MASE & SNYDER, a California         (8)  MONEY HAD AND RECEIVED
17   limited liability partnership, DAVID (9) UNFAIR BUSINESS
     VALDEZ, an individual, MARIO             PRACTICES
18   ERNST, an individual, MICHAEL       (10) INJUNCTIVE RELIEF
     GIGLIO, an individual, JAMIE
19   PURCELL, an individual, CFO911, a
     California entity of unknown form,
20   CHARLES DARGAN II, an individual,
     VEND CATERING SUPPLY, INC., a
21   California corporation, AMALFI
     CAPITAL GROUP, LLC, a Delaware
22   limited liability company, AMALFI
     JDM FORT WORTH, a limited liability
23   company, BERT FILTZER, an
     individual, ATHLONE GROUP, A.G.,
24   a Swiss corporation, JEFFERSON
     FINANCIAL, LLC, a limited liability
25   company, ACG FORT WORTH, LLC,
     a limited liability company, MJR FORT
26   WORTH, LLC, a limited liability
     company, PACIFIC EXCHANGE,
27   LLC, a limited liability company, SF
     FORT WORTH, LLC, a limited
28   liability company, QUADRELLE

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

2046311.1 24093-801

1
COMPLAINT

REALTY SERVICES, an entity of unknown form, DENNIS KALTHOFF, an individual, and DOES 1-10, inclusive,

                    Defendants.

Plaintiff GEMCAP LENDING I, LLC, complains of Defendants WESTERN FOODS DISTRIBUTION, JOHN MASE, JERRY A. BROWN, FAINSBERT, MASE & SNYDER, DAVID VALDEZ, MARIO ERNST, MICHAEL GIGLIO, JAMIE PURCELL, CFO911, CHARLES DARGAN II, VEND CATERING SUPPLY, INC., AMALFI CAPITAL GROUP, LLC, AMALFI JDM FORT WORTH, BERT FILTZER, ATHLONE GROUP, A.G., JEFFERSON FINANCIAL, LLC, ACG FORT WORTH, LLC, MJR FORT WORTH, LLC, PACIFIC EXCHANGE, LLC, SF FORT WORTH, LLC, QUADRELLE REALTY SERVICES, and DOES 1-10 as follows:

## JURISDICTION AND VENUE

1.      This Court maintains original subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964(a) and 28 U.S.C. § 1331.  Venue is proper in this forum under 18 U.S.C. § 1965(a) and (b), and 28 U.S.C. § 1391(a) & (b).

## THE PARTIES

2.      Plaintiff GemCap Lending I, LLC ("GemCap"), is, and at all times relevant was, a Delaware limited liability company with its principle place of business in Malibu, California.  All members of GemCap are domiciled in California.

3.      Defendant Western Foods Distribution, LLC ("Western") is a Nevada limited liability company with its principal place of business in Los Angeles County, California.

4.      Defendant John Mase ("Mase") is an individual residing in Los Angeles County, California.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

5.      Defendant Jerry A. Brown ("Brown") is an individual residing in Los Angeles County, California.

6.      Defendant Fainsbert, Mase & Snyder, LLP ("Fainsbert") is a California limited liability partnership doing business in Los Angeles County, California. GemCap is informed and believes, and on that basis alleges, that Mase and Brown are partners and/or shareholders in Fainsbert.

7.      Defendant David Valdez ("Valdez") is an individual residing in Los Angeles County, California.

8.      Defendant Mario Enrst ("Ernst") is an individual residing in Los Angeles County, California.

9.      Defendant Michael Giglio ("Giglio") is an individual residing in Los Angeles County, California.

10.     Defendant Jamie Purcell ("Purcell") is an individual residing in Los Angeles County, California.

11.     Defendant CFO911 is a California business entity of unknown form, but believed to be a partnership, with its principal place of business in Playa del Rey, California.

12.     Defendant Charles Dargan II ("Dargan") is an individual residing in Los Angeles County, California.

13.     Defendant Vend Catering Supply, Inc. ("Vend") is a corporation organized and existing under the laws of the state of California, with its principal place of business in La Mirada, California.

14.     Defendant Amalfi Capital Group, LLC ("Amalfi") is a Delaware limited liability company doing business in Los Angeles County, California.

15.     Defendant Bert Filtzer ("Filtzer") is an individual residing in Switzerland, but who has and is conducting business in Los Angeles County, California.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    16.    Defendant Athlone Group, A.G. ("Athlone") is a Swiss Corporation

2  doing business in Los Angeles County, California.

3    17.    Defendant Jefferson Financial, LLC ("Jefferson"), is a limited liability

4  company doing business in Los Angeles County, California.

5    18.    Defendant Dennis Kalthoff ("Kalthoff") is an individual and was and is

6  Western's purchasing manager during the events alleged below.  Kalthoff has,

7  through his participation in Western's operations and his activities in conjunction

8  with Mase and Ernst, conducting business in Los Angeles, California.

9    19.    GemCap is informed and believes that Mase additionally owns or

10  controls a series of limited liability companies or entities that hold interests in real

11  property Mase owns or controls in Texas, and which have – as alleged below –

12  improperly received proceeds of the loan that GemCap issued to Western in 2013

13  and/or otherwise improperly received collateral that secured the loan.  Those

14  entities, defendants AMG Fort Worth, LLC ("AMG"), Amalfi JDM Fort Worth,

15  LLC ("Amalfi JDM"), MJR Fort Worth, LLC ("MJR"), Pacific Exchange, LLC

16  ("Pacific"), SF Fort Worth, LLC ("SF"), and Quadrelle Realty Services

17  ("Quadrelle"), are each limited liability companies or corporations that conduct

18  business in Los Angeles County, California though Mase.

19    20.    GemCap is presently unaware of the identity of Defendants Does 1

20  through 10, inclusive, because its investigation of the matters relating to this

21  Complaint is ongoing and their identity has yet to be uncovered.  GemCap is

22  informed and believes that these fictitiously named defendants, and each of them,

23  are responsible for some or all of the acts alleged in this Complaint, and/or

24  participants in the scheme alleged below, and thus are wholly or partially

25  responsible for the damages GemCap has incurred in this matter.  GemCap will,

26  upon discovering the true identities of these fictitiously named defendants, amend

27  this Complaint accordingly.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

2046311.1 24093-801

4

COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    21.    GemCap is informed and believes, and based thereon alleges, that each

2  of the Defendants named herein was the agent, servant or employee of each of the

3  other Defendants, and was acting within and pursuant to such agency, authority and

4  employment.  Each of the Defendants is responsible for the losses, damage and

5  harm suffered by GemCap alleged herein.

6    22.    GemCap is informed and believes, and based thereon alleges, that each

7  of the Defendants named herein conspired and agreed among themselves to do the

8  acts complained of herein and were, in doing the acts complained of herein, acting

9  pursuant to said conspiracy, and that each Defendant sued herein is jointly and

10  severally responsible and liable to GemCap for the damages alleged herein.

## GENERAL ALLEGATIONS

### GemCap's Business

13    23.    GemCap is a family-run asset based commercial lender that has

14  established a thriving niche serving small and mid-size businesses in need of

15  funding unavailable from larger and traditional lending institutions.  Formed in

16  2008, GemCap has built a reputation for integrity, diligence and fair play among

17  borrowers, and has consequently seen dramatic growth in its loan portfolio in the

18  past five years.

19    24.    The basic business blueprint is straightforward.  GemCap receives over

20  $1 billion in loan requests annually, many from distressed companies that cannot

21  turn to or rely upon conventional funding.  The company then assesses the asset

22  base of each prospective borrower to determine if sufficient tangible and

23  recoverable assets – typically taking the form of equipment, inventory and accounts

24  receivable – exist to secure the requested loan and make GemCap whole in the event

25  of a default.  If so, and the borrower otherwise qualifies, appropriate funding and

26  security terms are negotiated.

27    25.    Once a loan is approved, GemCap typically funds on a revolving basis

28  subject to a specified limit, a structure under which the borrower must demonstrate

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   that its asset base and liquidity warrant continued lending. More specifically,

2   borrowers must accompany each request for funding with a borrowing base

3   certificate delineating the available inventory, accounts receivable and other loan

4   security, and establishing that the borrower is entitled to receive funding in the

5   requested amount. These certificates are essential for GemCap, given that they are

6   the central instrument in the funding process and are relied upon in making lending

7   decisions. Where GemCap funds a request based on a certificate exaggerating the

8   borrower's attachable asset base and/or otherwise misrepresenting the financial

9   picture such that the borrower is not eligible to receive the funding it has requested,

10   the result is an overadvance – *i.e.*, the borrower has been funded in an amount

11   exceeding its eligibility. GemCap engages in ongoing due diligence concerning

12   certificates and the borrower's representations in them – by, among other things,

13   routinely auditing the borrower's certificates and financial circumstances – in order

14   to avoid overadvances. But some inevitably occur, and GemCap's loan documents

15   invariably require that they be repaid immediately. Where they are not, GemCap

16   then pursues its rights against the pledged security or, when necessary, initiates

17   litigation. By virtue of the transparency of its business practices, the

18   comprehensiveness of the security it obtains as part of its loan agreements, and its

19   willingness to work with borrowers toward constructive resolutions of disputes,

20   litigation has been rare for GemCap. As explained below, however, it is necessary

21   in this case.

22   **The Loan Scheme At The Heart Of This Dispute**

23       26.   This case is the culmination of the Defendants' long term and

24   systematic scheme to secure loan financing through misrepresentations and illegal

25   artifice, of which GemCap is merely the latest victim. As alleged below, this

26   conspiracy – led principally by Mace, Brown, and Ernst and perpetrated through

27   entities they control – has practiced a classic shell game, in which the conspirators

28   solicited financing for a particular entity by falsely representing the scope of that

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  entity's assets or pledgeable collateral, and then stripping the entity of the

2  represented assets or collateral once loan funding was received.  The result was, in

3  each instance, a lender issuing a loan to what it believed to be a viable business with

4  appropriate security, only to later discover that the "borrower" was failing and that

5  the pledged collateral was illusory or had long-since been transferred elsewhere.  In

6  all, the defendants have borrowed and absconded with upwards of $20 million in

7  furtherance of this conspiracy – amounts that have essentially disappeared – and

8  have defrauded multiple lenders and financial institutions in the process.  Having

9  run out of prospective victims, the defendants must now answer for their

10  misconduct.

11  **2005-2010 – The U.S. Bank Loan And The Beginning Of The Scheme**

12       27.    The starting point of this unfortunate story dates at least to 2005, when

13  a pair of businesses that Ernst owned and controlled, TLD Distribution Company

14  and Vegas Bar & Restraurant Supply, LLC ("TLD/Vega") entered into a revolving

15  line of credit with U.S. Bank National Association ("US Bank").  TLD/Vega

16  purchased food and supplies for restaurants, and Ernst ran the business with a

17  partner named Michael Dodo ("Dodo").  By early 2010, with US Bank having

18  loaned well in excess of $10 million under this facility, TLD/Vega was experiencing

19  financial problems.  Ernst blamed the problems on Dodo's alleged embezzlement of

20  corporate funds, and Dodo did in fact leave the business sometime that year.  That

21  departure did not solve TLD/Vega's financial problems, however, and these

22  combined borrowers got deeper and deeper in the hole with US Bank.

23       28.    Around this same time, Mace appeared on the scene, and his

24  machinations with Ernst were not far behind.  Mace owned a commercial property

25  in Fort Worth, Texas, and was attempting to obtain financing for the operations of

26  that property.  That financing was proving elusive in light of the property's

27  occupancy rate, and Mase told Ellis that he addressed that problem by striking a deal

28  with Ernst in which Mace could report higher occupancy of the building and Ernst

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   would receive much needed cash in return.  Specifically, Ernst agreed that a
2   company he owned and/or controlled, Vegas Supply & Concessions, would become
3   a tenant in Mace's building under a "Master Lease," and Mace reciprocated by
4   providing TLD/Vega $150,000.  GemCap is informed and believes, and on that
5   basis alleges, that Vegas Supply & Concessions never conducted any meaningful
6   operations from Mace's facility, and that this "lease" was instead a subterfuge
7   designed to convey the false impression that the property's rent rolls had improved,
8   all for purposes of enhancing Mace's chances of securing financing.  This was only
9   the beginning of Mace's and Ernst's collective misconduct.

10  **2011-2012 – Mace And Partner Purchase The U.S. Bank Debt, And Then**
11  **Facilitate A New Loan From TAB Bank**

12          29.    By the fall of 2011, the financial situation for TLD/Vega had worsened
13  considerably and the enterprise was badly in need of additional credit.  Ernst turned
14  to David Ellis ("Ellis"), one of GemCap's principals, in an effort to put his hands on
15  much needed financing.  Ernst had previously been introduced to Ellis, though the
16  two did know each other well.  Ernst nevertheless asked Ellis to assist in the effort
17  to locate a new lender, and articulated the story about Dodo's purported
18  embezzlement.  But Ernst declined to tell Ellis the depths of TLD/Vega's financial
19  distress, nor how limited the enterprises' assets and collateral were.  Ellis, unaware
20  and having no reason to know how bad the situation was, directed Ernst to a series
21  of potential lenders, including Transportation Alliance Bank, Inc. ("TAB Bank").

22          30.    A few months later, in February or March 2012, and while Ernst was
23  negotiating financing with TAB Bank, Mace stepped in with a partner and
24  purchased the US Bank debt for a fraction of the outstanding balance of the loan.
25  The specific details of the transaction entailed a Mace-controlled entity, Jefferson
26  Financial, LLC ("Jefferson"), buying the debt collectively with another company,
27  Athlone Group A.G. ("Athlone"), that Ernst's cousin Bert Filtzer ("Filtzer") owned
28  or controlled.  The total amount due on the loan at the time was approximately $15.5

1 million and Jefferson and Athlone acquired it for a mere $3.5 million.  In other

2 words, US Bank took a $12 million loss on its loan.  US Bank would not be the last

3 lender to find itself upside down on a loan to entities under the stewardship of Ernst

4 and Mace.

5    31.    On March 19, 2012, contemporaneous with the Jefferson/Athlone

6 acquisition, TAB Bank agreed to provide accounts receivable financing and an

7 inventory advance agreement with TLD/Vega.  This was an asset based loan, in

8 which TAB Bank agreed to advance funds in much the same way GemCap operates:

9 by lending against the pledged collateral and only up to a point that the collateral

10 warrants.  But GemCap is informed and believes, and on that basis alleges, that

11 Mace and Ernst misrepresented the true financial status of TLD/Vega and overstated

12 the assets and collateral supporting the loan, both at the outset and as they requested

13 additional advances under the credit facility TAB Bank agreed to provide.  GemCap

14 is additionally informed and believes, and on that basis alleges, that TAB Bank

15 would not have extended this loan facility to TLD/Vega had it known the true state

16 of affairs.

17    32.    Not surprisingly, given the situation, the TAB Bank loan slipped

18 quickly into default.  Ernst complained to Ellis that TAB Bank did not understand

19 TLD/Vega's business and that – not Ernst's overstatement of the assets and viability

20 of the borrower – was the reason problems emerged so rapidly.  By July 2012, Ernst

21 informed Ellis that TLD/Vega would be forced to suspend operations because of the

22 status of the TAB Bank loan.  But Ernst, never short of pockets to pick, told Ellis

23 that he had a shell company – Vega Supply & Concessions. Inc. ("VSC") – that he

24 wanted to finance in order to initiate a new business under the VSC name and asked

25 whether Ellis' business would consider such an arrangement.  GemCap, despite

26 Ernst's general (though distant) acquaintance with Ellis, approached the request

27 strictly in an arm's length manner, as it would negotiate any loan request.  Ernst

28 made representations and provided due diligence material that GemCap relied upon

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  in agreeing to the requested funding.  Thus, on August 13, 2012, GemCap and VSC

2  entered into an inventory and receivables supported revolving loan facility.

3

4  **August 2012-January 2013 – GemCap Acquires the TAB Bank Note, And**

5  **TLD/Vega Finally Collapses**

6      33.    The GemCap-VSC loan did not obviate the mounting problems with

7  TLD/Vega's TAB Bank loan.  Ernst continually represented and assured Ellis that

8  TAB Bank and its administration of the loan was the problem.  Acting on those

9  representations, and other material provided by Ernst and TLD/Vega that purported

10  to show the enterprise had the wherewithal to survive and the collateral to ensure

11  repayment, GemCap agreed, after being approached independently by both Ernst

12  and TAB, to acquire the TAB Bank indebtedness in August 2012, though at a steep

13  discount.  The total amount outstanding on the loan at the time was nearly $5.5

14  million, and GemCap purchased the debt for a mere $1.5 million – a loss to TAB

15  Bank of nearly $4 million.  Victim number two takes a dramatic loss on Ernst, Mace

16  and their alter ego entity TLD/Vega.

17      34.    GemCap, acting as a responsible lender, moved to avoid the same fate.

18  It insisted, as part of the acquisition transaction, that the purchased loan be amended

19  and restated in its entirety (and notwithstanding the discounted purchase price) and

20  that Jefferson/Athlone (which had bought the US Bank debt) subordinated their

21  interest to GemCap's.  Those steps proved prophetic, because TLD/Vega defaulted

22  on the amended and restated loan and GemCap formally noticed that default on

23  November 28, 2012.  A public sale was noticed for January 2013, and GemCap

24  prepared to sell the existing collateral in vindication of its security rights.

25      35.    Mace, facing the loss of his investment in TLD/Vega but grasping for

26  ways to get another lender on the hook, approached Ellis and asked if GemCap

27  would finance his acquisition of the TLD/Vega assets through a new entity he had

28  formed, Western.  Mace explained that by purchasing the collateral through

2046311.1 24093-801

10

COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  Western, he could recoup his investment in TLD/Vega. GemCap had no interest in

2  financing an entity that was merely a continuation of TLD/Vega under another

3  name, and thus imposed some conditions on Mace before considering the loan.

4  First, Western would need to truly be a new entity, and not a barely distinct

5  successor to TLD/Vega. Second, and related to that, GemCap insisted that Western

6  not share the same management team that had run TLD/Vega into the ground. That

7  specifically included a prohibition on Ernst being any part of the new enterprise's

8  business – GemCap was clear that no financing was available if Ernst participated in

9  Western's management – GemCap understood, and was told, that Ernst would serve

10  only as an interim transitional consultant, who would assist in shifting customer

11  relations, etc., from TLD/Vega to Western.. Finally, Mace would need to

12  demonstrate that Western had the capacity to operate and survive under the

13  conditions GemCap had set, and would not conduct itself the way TLD/Vega had.

14      36.    Mace provided GemCap assurances that all these conditions would be

15  met, including Ernst's exclusion from Western's operational business. Ellis and

16  GemCap, reasonably relying on these representations, agreed to provide the

17  requested financing. GemCap believed it was lending to a newly formed company

18  headed by new management and transactionally independent of TLD/Vega and

19  Ernst. What it later discovered was that Western – which formally acquired the

20  assets at a public sale GemCap conducted on January 31, 2013 – was merely the

21  latest corporate vehicle through which Mace and Ernst solicited and received

22  financing, and it was the most naked manifestation of their self-dealing and

23  fraudulent scheme.

24  **Mace And Ernst Misrepresent The True Nature Of Western, And Induce**

25  **GemCap To Approve A Loan Facility Based On A Knowing Overstatement Of**

26  **Collateral**

27      37.    The January 31, 2013 sale, as noted, ushered in Western as a new

28  Mace/Ernst controlled entity that would conduct the food and restaurant supply

1  business previously housed under TLD/Vega name.  In fact, there is no question
2  now that despite GemCap's demand and Mace's assurance that Ernst would play no
3  role in the new company, Ernst was intimately involved in Western's day-to-day
4  business.  And while it's hardly unusual or improper for a new company to be
5  formed to acquire assets in this manner, GemCap had no idea that this transaction
6  was merely the continuation of the illegal artifice that had led to massive losses by
7  US Bank and TAB Bank.  Had it known the true facts, there is no way GemCap
8  would have agreed to the loan.

9      38.    The basic construct of Western reveals the scope of the incestuousness
10  among the defendants in the business, and the extent to which they eroded critical
11  lines separating their duties as officers and, in the case of Mase and Brown, counsel
12  to the company.  The members of Western are Amalfi, which Mase owns and
13  controls, and Athlone, Filtzer's Swiss corporation.  Mase and Filtzer are the same
14  parties that bought TLD/Vega's US Bank debt for a stark discount two years earlier.
15  Mase's law firm, Fainsbert, served as Western's counsel in negotiating the loan
16  terms with GemCap – which were being brokered during the period leading to the
17  January 31, 2013 sale.  Making matters worse, the specific lawyer negotiating on
18  Western's behalf, Mase's law partner Brown, also served as the company's vice-
19  president who – as alleged below – routinely executed corporate documents in that
20  capacity.  Ernst was identified in January 2013 as a mere consultant to Western,
21  though GemCap later learned that the scale of his involvement was much more
22  extensive (and was concealed from it).  Purcell served as the company controller and
23  Giglio was extensively involved in sale and warehouse operations.  The latter was
24  crucial since GemCap ultimately discovered that Western exaggerated its available
25  inventory and thus its entitlement to advances under the loan facility.

26      39.    GemCap did not know it at the time, but this same cast of characters
27  had duped US Bank and TAB Bank out of more than $15 million.  It would soon
28  discover that Western was little more than a fraudulent artifice.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**The Loan Agreement Itself**

40.    GemCap and Western entered into a loan agreement dated January 31, 2013, by and between GemCap, as lender, and Western as borrower (the "Agreement").  The parties later executed, on April 26, 2013, an Amendment to the Agreement.  A true and correct copy of the Loan Agreement and the April 26, 2013 Amendment are attached to this Complaint as Exhibits "1" and "2," respectively, and is incorporated herein as though set forth in full.

41.    The Loan Agreement provides for a revolving credit facility to Western in the maximum principal amount of $7,500,000.00, and contains several provisions relevant to this Complaint:  (1) Section 14.9 provides that the laws of the State of California shall govern the Loan Agreement; (2) Section 2.3 provides that "Borrower shall use the proceeds of the Loans solely for the purposes set forth in Section 1(d) the Loan Agreement Schedule."; and (3) Section 11 of the Loan Agreement specifies the events constituting a default, including the specification in Section 11.3 that a default occurs upon "Borrower's failure to perform or observe any covenant, term or condition of this Agreement or in any other Loan Document."

42.    The Agreement also provides that, as collateral for the loan, GemCap maintains a first priority security interest in and lien upon "all now owned and hereafter acquired property and assets of Borrower and the Proceeds and Products thereof."  That pledge of security, at Section 5.1 of the Agreement, delineates the full scope of assets and property comprising the collateral and, for purposes of this action, indisputably includes all of Western's accounts receivable and inventory. Paragraph 5.4  provides a complimentary requirement concerning the disposition of the pledged collateral:

"5.4(e) **Representations, Warranties and Covenants Concerning the Collateral**. It shall not dispose of any of the Collateral whether by sale, lease or otherwise except for (i) the sale of Inventory in the ordinary course of business and (ii) the disposition or transfer in the ordinary

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

course of business of Equipment if consented to in advance in writing by Lender, in Lender's sole discretion, and then only to the extent that the proceeds of any such disposition are used to acquire replacement Equipment which is subject to the Lender's security interest or are used to repay the Obligations, as determined by Lender.

*      *      *

5.4(m).  Borrower shall maintain and keep all of its books and records concerning the Collateral at its executive offices listed in <u>Section 5.4(l) of the Borrower's Disclosure Schedule</u>."

43.     There representations and warranties in the Agreement further emphasize the existing preservation concerning the Collateral and the records. Paragraph 8.1 demands that "Borrower maintains its chief executive office and its books and records related to its Accounts, Inventory and all other Collateral at its address set forth in <u>Section 5.4(l) of Borrower's Disclosure Schedule</u>."  Paragraph 8.4(a) represents that "No Event of Default" existed at the time the loan was entered, and among the events of default identified in Paragraph 11 are any false representation of warranty (¶ 11.5).  Thus, for example, if Paragraph 8.20, provides that there had not been any change – since the collateral and financial reporting made to induce the loan – in Western's "business, assets, liabilities, condition (financial or otherwise), properties, operations or prospects."  In other words, Western represented and warranted that its reporting of its available collateral and its financial condition were accurate at the time the loan was made.

44.     Likewise, Paragraph 9 delineates that scope of Western's obligation to maintain its books and records:

**"Section 9 Affirmative Covenants**

9.11 Records.  Borrower shall at all times keep accurate and complete

records of its operations, of the Collateral and the status of each Account, which records shall be maintained at its executive offices as set forth on Section 5.4(l) of Borrower's Disclosure Schedule.

9.14(b) Name Change; Location Change - Borrower shall deliver not less than thirty (30) Business Days prior written notice to Lender if Borrower intends to conduct any of its business or operations at or out of offices or locations other than those set forth in this Agreement, or if it changes the location of its chief executive office or the address at which it maintains its books and records."

45. Finally, and critically, Paragraph 10 flatly prohibits the sale, transfer or conveyance of any of the Collateral:

**"Section 10. Negative Covenants**

10.2 Disposition of Assets or Collateral. Borrower will not sell, lease, transfer, convey, or otherwise dispose of any or all of its assets or Collateral, other than the sale of Inventory in the ordinary course of business or the sale of Equipment solely to the extent expressly permitted with Lender's prior written consent under Section 5.4(e) hereof."

46. These clauses exist for a reason. They protect GemCap's rights under the Loan Agreement – and specifically relating to the Collateral securing the loan – by requiring that all Collateral and records be maintained and preserved. Thus, if these requirements are not satisfied, the very essence of GemCap's benefit of the bargain concerning the Loan Agreement is sacrificed.

47. To further ensure GemCap's rights to the pledged collateral, Western irrevocably appointed GemCap as attorney-in-fact. That appointment, at Section 13.3 of the Loan Agreement, provides that, *inter alia*, "as its true and lawful attorney-in-fact, with full irrevocable power and authority in its [Western] place and stead and in its name or otherwise, from time to time in Lender's [GemCap] discretion, at Borrowers sole [Western] cost and expense, to take any and all

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   appropriate action . . . which the Lender may deem reasonably necessary or

2   advisable to accomplish the purposes of this Agreement, including without limiting

3   the generality of the foregoing . . . after or during the continuation of an Event of

4   Default . . . take or bring, in the name of the Lender or Borrower, all steps, actions

5   suits or proceedings deemed by Lender necessary or desirable to effect collection of

6   or other realization upon the Collateral . . . ."  (*Id.* at ¶ 13.3(a)(C)(ii)(D)).

7   ### The Loan Agreement Schedule

8   48.    The Loan Agreement was accompanied by a Loan Schedule, also

9   executed on January 31, 2011, a true and correct copy of which is attached to this

10  Complaint as Exhibit "3" and is incorporated herein as though set forth in full.  The

11  Schedule, at Section 1(c)(v), prescribes the specific manner in which Western could

12  request funding and requires the submission of a borrowing base certificate (the

13  "Borrowing Certificate") substantiating the request and demonstrating Western's

14  entitlement to the amount:

15  "**(v)    Borrowing Procedures.**  Whenever Borrower desires an Advance,

16  Borrower will notify Lender by delivery of a borrowing certificate certified

17  by a Responsible Officer ("Borrowing Certificate") no later than two (2)

18  Business Days prior to the date of the proposed Advance, setting forth in

19  reasonable detail, as of the date set forth on the Borrowing Certificate, (A) a

20  schedule of Eligible Crop Insurance Contract Receivables setting forth the

21  calculation of the Eligible Crop Insurance Contract Receivables on which

22  such Advance is to be based and a calculation of the Advance requested in

23  connection therewith; and (B) a schedule of the aggregate amount of funds in

24  the Crop account on which such Advance is based, which Borrowing

25  Certificate shall in all respects be subject to the Lender's review and

26  approval."

27  49.    These Borrowing Certificates – which Brown and Dargan executed

28  over the life of the Western loan – are binding representations and warranties

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

concerning the facts set forth in each certificate, including that the reported accounts receivable are genuine obligations to the borrower and that the listed inventory and equipment are in the borrower's possession and control.  Lest there be any doubt, the body of the certificates articulate the scope of the representations:

"Borrower hereby (a) as security for the repayment of Borrower's present and future indebtedness to GemCap Lending I, LLC, (herein "GemCap"), assigns, transfers and pledges to GemCap, its successors and assigns, and gives and agrees that GemCap has a security interest in, under and pursuant the Loan and Security Agreement and/or other financing instruments between Borrower and GemCap, the Accounts specifically described in the invoice copies or schedules of accounts receivable attached hereto and identified herein, and the Inventory (i.e. Merchandise) generally identified herein or described in lien statements or security agreements attached hereto, and in all presently outstanding Accounts and in all Inventory now owned by Borrower, and all Accounts and Inventory hereafter created, acquired or purchased by Borrower; (b) warrants and certifies to GemCap that all Accounts created since the prior Report are evidenced by invoice copies or schedules of accounts receivable attached hereto, and that the total of all Accounts on the books and records of Borrower at said date is as shown and there is now owing on Accounts that amount; (c) warrants and certifies to GemCap that all inventory made or acquired since the prior report is identified herein or is evidenced by suppliers' invoices, purchased journals, production reports, or other records attached hereto, and that the total of all inventory of Borrower is as shown as of the date shown hereon for Inventory and that Borrower now has in its possession and control, or in the possession of a third party of its account which third party has been identified in writing by Borrower to GemCap, Inventory in that amount; (d) warrants that the total of withdrawals since the prior report are as shown;  and (e) warrants that all collections

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

received or credits allowed on Accounts previously assigned to GemCap have been duly and regularly entered to the credit of the respective debtors on the books and accounts of Borrower; that all such collections have been remitted and all such credits have been reported to GemCap promptly; that none of the Accounts previously or hereby assigned have been sold, assigned or pledged to any other party; and that prompt report has been made to GemCap of returned or rejected goods covered by any Account previously assigned, with payment to GemCap of the amount thereof. Furthermore, Borrower attests that all Equipment set forth in Exhibit 1.36 under and pursuant to the Loan and Security Agreement, (i) is in Borrower's possession; (ii) is located at Borrower's primary business location; (iii) has been maintained according to an industry-standard maintenance schedule; (iv) is in good order and repair, and in running and marketable condition, ordinary wear and tear excepted. Borrower certifies that (1) the Company is not in Default according to the terms of the Loan and Security Agreement by and between Company and GemCap * * * ("Agreement"), (2) that all of the Representations in the Agreement are true and correct as of the date hereof, and (3) there of the Representations in the Agreement are true and correct as of the date hereof, and (3) there has been no material adverse change in the financial or operations of the Company."

50.    This requirement, and the representations in the Borrowing Certificates, stand at the core of the Agreement and Western's contractual obligations.  Simply put, GemCap loans on the basis of the Borrowing Certificates, and where an inaccurate Borrowing Certificate is submitted it runs the risk of advancing funds that a borrower is not entitled to receive, creating an overadvance.  And where an over-advance occurs, paragraph 1(c)(iv) of the Schedule requires that it be repaid immediately.

51.    Beyond that, the Schedule restricts the permissible use of proceeds to a small set of activities: "For the public sale purchase of the assets of TLD Acquisition Co., LLC, Vegas Bar & Restaurant Supply, LLC, and Vega Supply & Concessions LLC, and for Borrower's ordinary course working capital needs."

52.    The Schedule additionally requires, at Section 7(b)(iii), Western to provide monthly financial statements to GemCap – certified by the Chief Financial Officer – within thirty days after the close of each month.  That, coupled with a similar obligation to furnish quarterly financial statements and other books and records on a continuing basis, was intended to allow GemCap to monitor the company's financial progress.  As alleged below, Western has breached all of these cited provisions, and has done so repeatedly.

**Mase's Validity Guaranty**

53.    GemCap insisted that Mase – who represented himself as a well-known tax attorney to Ellis – execute a guarantee in connection with the Agreement, since he was clearly the individual exercising the greatest dominion over Western.  The resulting Validity Guaranty (the "Guaranty") was intensely negotiated by the parties, and provides that Mase "absolutely, unconditionally, and irrevocably guarantees to Lender the full and prompt payment, satisfaction and performance of any and all" obligations under the loan, where GemCap's losses arise from: (1) fraud or misrepresentation by Mase to GemCap in connection with the Agreement or the loan documents; (2) bad faith acts, fraud, or willful misconduct by Mase, or if Mase causes Western to commit such acts; (3) the removal, disposal or redirection of portion of the collateral in violation of the Agreement or the loan documents; (4) any interference by Mase with GemCap's rights under the Agreement or the loan documents; and (5) any misappropriation of any loan proceeds by Mase that impairs the value of the collateral of otherwise impairs GemCap's rights under the Loan Agreement or the loan documents.  Mase reaffirmed the Guaranty on April 26, 2013 – in conjunction with the amendment to the Agreement – and true and correct copies

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  of the Guaranty and Mase's reaffirmation of it are attached as Exhibits "4" and "5,"

2  respectively, to this Complaint.

3  **January-June 2013 – The Introduction Of CFO911, Dargan And Valdez, And**

4  **GemCap Discovers Erroneous Borrowing Certificates, Resulting**

5  **Overadvances, And Rampant Wasting Of Pledged Collateral**

6      54.    This loan, despite the fastidiousness of the negotiations and GemCap's

7  due diligence, followed the pattern set by its predecessor transactions with US Bank

8  and TAB Bank. It all started uneventfully, although unusually. Brown, one of

9  Western's lawyers, signed all the Borrowing Certificates between February 1 and 5,

10  2013. At that point, Western entered into an agreement with CFO911 under which

11  CFO911 acted as the company's president until such time as Mase – the *de facto*

12  head of the business – found a permanent president. Dargan signed a series of

13  Borrowing Certificates thereafter, many or most of which – GemCap later

14  discovered – were erroneous and false.

15      55.    The first sign of trouble arose in March 2013, when Mase approached

16  Ellis and asked for a reduction in the interest rate on the loan. GemCap was then

17  aware of an existing overadvance of about $100,000, and Ellis agreed to reduce the

18  interest if Mase agreed to contribute additional capital to pay down that amount.

19  That led to the April 26, 2013 Amendment to the Agreement – which lowered the

20  interest rate – and Mase's reaffirmation of the Validity Guaranty. As promised,

21  Mace paid Western's $100,000 overadvance, and Dargan executed the loan

22  Amendment as "acting president."

23      **The June 2013 Audits**

24      56.    Western maintained three warehouse facilities that purportedly housed

25  its inventory: one in Commerce, California, and two others in Las Vegas, Nevada

26  and Fort Worth, Texas. In June 2013, GemCap conducted audits of the pledged

27  collateral at all three locations to ensure that the amount of the collateral comported

28  with that reported on the Borrowing Certificates. This was a routine step for

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  GemCap – as an asset based lender, its due diligence continues after a loan is
2  approved, and it conducts audits of pledged collateral in connection with all its
3  borrowers.  In this case, the audits began unraveling the full scope of Western's
4  misrepresentations and misconduct.  To start, GemCap – through a third party
5  auditor – examined the receivables and inventory at the Commerce property and
6  found no variance with the inventory Western had reported.  That was the end of the
7  good news, however.  Unannounced audits of the Las Vegas and Fort Worth
8  properties revealed significant discrepancies in both places, meaning Western was
9  reporting collateral on Borrowing Certificates and receiving loan advances on the
10  strength of that reporting – that it did not actually hold.  In other words, Western
11  received loan proceeds to which it was not entitled under the Agreement.

12      57.    The more GemCap looked into the issue, the worse things got.  Ellis
13  informed Mase of the shortfalls in June 2013, and on June 20 Richard Ellis and
14  another GemCap employee met with Valdez and Dargan at GemCap's offices.  The
15  latter two acknowledged there were "serious shortfalls" in the reported collateral
16  and claimed that GemCap – an asset based lender – was now their "equity partner."
17  And therein lies what appears to be Western's ambition from the start: induce
18  GemCap into advancing substantial sums under the Agreement knowing the
19  collateral was insufficient to support the advances, but assuming that at some point
20  GemCap would have loaned such substantial amounts that it would have no
21  alternative but to participate effectively as an equity party in order to be repaid.
22  GemCap had no interest in that arrangement, of course, and instead began taking
23  steps to determine how to proceed to protect the collateral and ensure its ultimate
24  repayment.

25      **June-July 2013 – Negotiations Over A "Work Around" Lead Nowhere,**
26      **And GemCap Issues A Notice Of Default**

27      58.    After discovering the inventory discrepancies, GemCap initiated
28  discussions with Western, Mase, Dargan and Valdez about a potential resolution

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    where GemCap would agree to a modified or amended repayment plan if certain

2    conditions were met.  This was also not unusual – GemCap routinely attempts to

3    work with distressed borrowers, and typically resorts to the sale of collateral or

4    litigation only after those efforts are proven to be fruitless.  In this case, the "work

5    discussions" did not yield any feasible resolution, but they did result in the

6    disclosure of information demonstrating not only that Western serially

7    misrepresented the amounts of "eligible collateral" – meaning amounts that could

8    support loan advances – but that it systematically disposed of collateral in brazen

9    contravention of the clear terms of the Agreement.

10       59.    First, Valdez inadvertently disclosed in a June 21, 2013 meeting with

11   Ellis –in which Valdez was proposing a resolution involving Western's investors

12   contributing additional capital and GemCap forestalling the sale of collateral until

13   cash flow improved – that a "sublessee" was making payments to Western at the

14   Fort Worth facility.  When pressed on the issue, Valdez claimed that the sublessee

15   was a vendor that had been in place for some time and was in the same business as

16   Western.  In other words, Valdez was effectively saying that Western was leasing

17   space in its own building to another entity in the same business and that would

18   presumably have duplicative inventory.  This disclosure raised the specter that

19   Western was shifting its own inventory to this "sublessee" as a means of avoiding

20   GemCap selling it under the terms of the Agreement.

21       60.    Second, and at the same meeting, Valdez claims that Purcell, the

22   company controller, has information concerning the inventory shortfalls and that

23   GemCap should speak with her about the scope of the shortfalls.  GemCap attempts

24   to do so, but Western never allows Purcell to speak with Ellis or anyone else

25   representing the lender.  That said, Valdez informs Ellis that Dargan had spoken to

26   Purcell and she reported that inventory had been overstated in a total amount of $1.7

27   million to $1.8 million.  In all, Valdez estimated the Borrowing Certificates had

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  been inflated in an amount of roughly $1 million to $1.35 million (meaning Western

2  falsely claimed entitlement to advances in that amount).

3      61.    Third, while negotiations were ongoing, on July 5, 2013, Mase

4  informed Ellis and his brother Richard (another GemCap principal) that Western

5  would not meet its payroll that day.  The Ellises responded by inquiring as to who

6  was communicating with the Western employees and what steps were being taken to

7  preserve the collateral.  Mase and Valdez ultimately informed the Ellises that

8  employees were told that "the lender was not accepting equities proposal" and thus

9  there was no cash for payroll, and that the employees had been told to pack up and

10  leave for the day after any deliveries had been received.  Mace and Valdez were

11  effectively telling GemCap that nothing was being done to preserve the collateral.

12  GemCap, naturally concerned about the situation, instructed an employee to drive

13  by the Commerce facility on July 5 to observe the activities at the site.  What he

14  reported was worse than a mere abandonment of the pledged security for the loan:

15  the employee reported that he saw Western employees still at the location and, most

16  ominously, trucks removing collateral from the location.

17      62.    Fourth, an increasingly alarmed GemCap attempted in the early days of

18  July 2013 to obtain some basic understanding of the state of the pledged collateral.

19  But Western was in no mood to cooperate by that time – GemCap having refused to

20  capitulate to Mase's demands for unreasonable concessions in the negotiations to

21  resolve the inventory shortfalls and the resulting overadvances – and promptly put

22  an end to those efforts.

23      63.    More particularly, Ellis contacted Valdez on July 8 and asked if a

24  GemCap employee could visit Western's Commerce site to obtain information on

25  the collateral that would need to be sold in liquidation.  That employee was kicked

26  out of Western's offices the next day, July 9, and GemCap has had no access to the

27  collateral since that time.  The same day, David and Richard Ellis met Mase and

28  Valdez in the Fainsbert office to discuss the possibility of a loan forbearance –

2046311.1 24093-801

23

COMPLAINT

1   which Mase was aggressively pursuing.  The Ellises forthrightly told Mase and

2   Valdez that they had never seen a more irresponsible handling of a business closure,

3   and that the admission of false collateral reports meant that GemCap could not

4   confidently disclose a list of assets to prospective purchasers in the event of a sale.

5   When the Ellises raised the issue of Mase's Validity Guaranty and its binding

6   nature, Mase threw them out of his office.  Negotiations effectively ended on that

7   date.

8   **The Notice Of Default, And What GemCap Now Knows**

9        64.    On July 9, 2013, the same day Western threw GemCap's employee out

10  of its offices and Mase did the same to the Ellises, GemCap served a formal Notice

11  of Default (the "NOD") on Western and Mase (as Guarantor).  The full amounts

12  then owing under the Agreement were $6,029,642.01, and a per diem rate of $47.70,

13  plus attorneys' fees.  Those amounts remain unpaid in their entirety.

14       65.    Since then, GemCap's investigation has continued, and it has

15  discovered that:  (1) Western vastly overstated the amount of its collateral, and its

16  viability as a running business, at the very outset of the loan transaction in January

17  2013; (2) Western systematically submitted Borrowing Certificates that false and

18  which reported eligible collateral substantially in excess of what the company

19  actually had in its possession; (3) those Borrowing Certificates were submitted by

20  Brown and Dargan predominantly – Dargan signed erroneous Borrowing

21  Certificates totaling about $3.1 million; (4) Western reported to GemCap, for

22  example, approximately $500,000 in collateral in Fort Worth at a time when only

23  about $37,000 worth of collateral actually existed at the site; (5) Western, and Mase,

24  Ernst, Gigilio and Purcell in particular, schemed – in direct response to GemCap's

25  pending audit – to overstate Western's existing collateral by reporting inventory

26  held by a third party as belonging to Western; (6) Ernst was intimately involved in

27  the day-to-day operations of the business, in direct contravention of Mase's

28  representations to GemCap in January 2013 and that induced GemCap to issue the

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   loan; (7) Western appears to have systematically removed collateral from its three

2   facilities, in violation of myriad provisions of the Agreement and in an obvious

3   effort to frustrate GemCap's rights to secure and liquidate that collateral; (8)

4   Western appears specifically to have transferred collateral to third parties, in

5   contravention of the Agreement; (9) Western has continued selling pledged

6   collateral to customers for cash, notwithstanding that it has purportedly ceased

7   operations; (10) Mase owns the building in Fort Worth where Western's facility is

8   located, and Ernst is presently a consultant working for Mase in connection with the

9   operations of that building; (11) Western's financial activity between February and

10  July 2013 reveals large discrepancies in the amount of revenue reported and the

11  amount of expenditures – meaning, in simple terms, the company was spending

12  substantially more money than it appears to have had on hand – suggesting that

13  Western misused GemCap's loan proceeds and/or otherwise knowingly reported

14  "phantom" inventory on its Borrowing Certificates in order to exaggerate its

15  borrowing rights; and (12) ominously, GemCap is informed and believes that Mase

16  and Ernst had previously organized another business solely for purposes of running

17  fictitious transactions, whereby fictitious inventory was reported on the books in

18  order for the company to borrow money against those phantom assets – in other

19  words, a fraud blueprint eerily similar to that GemCap has experienced in

20  connection with Western.

21      66.   Beyond all that, GemCap is informed and believes, and on that basis

22  alleges, that Mase has used the GemCap loan proceeds and the collateral securing

23  the loan to inflate the value of the building he owns in in Fort Worth – where

24  Western ostensibly had a facility.  This is the same building that served as a

25  platform on which Mase and Ernst orchestrated the highly questionable Vegas

26  Supply & Concession lease in 2010 (¶ 26, supra).  More particularly, GemCap

27  alleges, on information and belief, that Mase has diverted GemCap loan funds to

28  inflate the value of the building by, among other things, concocting bogus "leases"

with various entities that Mase owns or controls, including without limitation ACG, Amalfi JDM, MJR, Pacific, SF and Quadrelle.  The resulting and fraudulent inflation of the building's rent rolls would enhance its value in the event of a sale and/or would enable Mase to borrow funds against the building.  Additionally, GemCap is further informed and believes, and on that basis alleges, that these Mase diverted Western-pledged collateral to these entities – again including ACG, Amalfi JDM, MJR, Pacific, SF and Quadrelle – as part of the same effort.

67.    In short, Western was not what Mase and Brown said it was when soliciting GemCap's loan in early 2013.  It was instead part of an ongoing fraud dating to the US Bank loan, and was merely a continuing of the scheme begun with TLD/Vega.  In light of these circumstances, GemCap has no choice but to seek recompense and recovery in this Court.

## All Of The Business Entity Defendants Are Alter Egos Of The Individual Defendants

68.    As alleged above, many entities and individuals received proceeds from the GemCap loan to Western, which was unauthorized by the Loan Agreement. Each of those entities and the individuals who own and/or operate those entities are liable for the damages incurred by GemCap.

69.    The facts are such that an adherence to the fiction of the separate existence of each of the defendant entities would, under the particular circumstances, sanction a fraud and/or promote injustice.

### Amalfi Capital Group, LLC

70.    GemCap is informed and believes, and on that basis alleges, that Mase is Amalfi's principal member and/or he otherwise controls Amalfi's operations.

71.    Amalfi is not only influenced by Mase, but there is such a unity of interest and ownership that the individuality, or separateness, of Mase and Amalfi has ceased.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Athlone Group, A.G.**

72.    Filtzer owns and controls Athlone.

73.    Athlone is not only influenced by Filtzer, but there is such a unity of interest and ownership that the individuality, or separateness, of Filtzer and Athlone has ceased.

**Jefferson Financial, LLC**

74.    GemCap is informed and believes, and on that basis alleges, that Mase is Jefferson's principal member and/or he otherwise controls Jefferson's operations.

75.    Jefferson is not only influenced by Mase, but there is such a unity of interest and ownership that the individuality, or separateness, of Mase and Jefferson has ceased.

**Fainsbert, Mase & Snyder, LLP**

76.    GemCap is informed and believes, and on that basis alleges, that Mase and Brown are partners and/or shareholders in Fainsbert.

77.    Fainsbert is not only influenced by Mase and Brown, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and Fainsbert has ceased.  Beyond that, Mase's and Brown's activities as alleged above were undertaken in their capacity as partners in the Fainsbert firm and thus are indistinguishable from the firm.

**Western Foods Distribution, LLC**

78.    Amalfi is a member of Western.

79.    Athlone is a member of Western.

80.    Western is not only influenced by Amalfi, Athlone and their respective members, but there is such a unity of interest and ownership that the individuality, or separateness, of those entities, individuals and Western has ceased.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Kalthoff**

81.    GemCap is informed and believes, and on that basis alleges, that Kalthoff is and was Western's Purchasing Manager during all times relevant to this Complaint.[DE1]

82.    Kalthoff is not only influenced by Western, and Western by Kalthoff, but there is such a unity of interest and ownership that the individuality, or separateness, of Western and Kalthoff has ceased.

**CFO911**

83.    Dargan is the chief executive officer of CFO911.

84.    CFO911 is not only influenced by Dargan, but there is such a unity of interest and ownership that the individuality, or separateness, of Dargan and CFO911 has ceased.

**Additional Mase Owned/Controlled Entities**

85.    GemCap is informed and believes, and on that basis alleges, that Mase additionally owns and/or controls a number of limited liability companies or similar-type entities, which include the following:  ACG, Amalfi JDM, MJR, Pacific, SF, and Quadrelle.

86.    These Mase owned/controlled entities are not only influenced by Mase, but there is such a unity of interest and ownership that the individuality, or separateness, of Mase and those entities has ceased.

## FIRST CLAIM FOR RELIEF

### (Civil RICO Violations Against All Defendants)

87.    GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 85 as though fully set forth herein.

88.    The Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961 *et seq.*) provides that various acts involving the conduct of an enterprise through a pattern of racketeering activity are prohibited.

89.    The Defendants here, in contravention of RICO, conspired with one another to establish, maintain, and participate in a systematic enterprise to secure loan financing through fraudulent misrepresentations and illegal artifice, all with the purpose of enriching themselves at the expense of their victims, most notably GemCap.

90.    As alleged above, this conspiracy – led principally by Brown, Ernst, Mace and Valdez and perpetrated through entities they control – has practiced a classic shell game, in which the conspirators solicited financing for a particular entity by falsely representing the scope of that entity's assets or pledgeable collateral, and then stripping the entity of the represented assets and collateral once loan funding was received and misappropriating the loan proceeds for their own personal gain.

91.    The result was, in each instance, a lender issuing a loan to what it believed to be a viable business with appropriately pledged security, only to later discover that the "borrower" was failing and that the pledged collateral was illusory or had long-since been transferred elsewhere.

92.    In all, the Defendants have borrowed and absconded with upwards of $20 million in furtherance of this conspiracy – amounts that have essentially disappeared – and have defrauded multiple lenders and financial institutions in the process.  GemCap is their latest victim.

93.    More specifically, the Defendants have misrepresented the nature of their enterprise and illegally obtained loans from at least three lending institutions by means of several transactions as part of a pattern of defrauding unsuspecting lenders: (1) the US Bank loan dating to 2005; (2) the 2012 TAB Bank loan; and (3) the January 2013 GemCap loan.

94.    Defendants sought financing from GemCap as part of the last loan transaction after having consummated the prior fraudulent transactions.  GemCap

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  was innocently and unknowingly brought into the scheme initially when it acquired

2  the TAB Bank Note made by TLD/Vega, which collapsed shortly thereafter.

3      95.    The Defendants then established Western to continue their fraudulent

4  enterprise, and in January 2013, Mase solicited GemCap for financing purportedly

5  for Western's prospective operations.  But Mace – the primary architect of the

6  conspiracy – misrepresented the true nature of Western and induced GemCap to

7  approve a loan facility based on a knowing overstatement of Western's assets and its

8  viability as a running business.  In doing so, Mase and the other defendants

9  communicated their misrepresentations and falsehoods to GemCap by means of the

10  interstate wires (in the form of e-mail, telephone and other electronic and telephonic

11  communications) and the interstate mails.  Indeed, the Defendants provided false

12  and inflated financial data concerning Western to GemCap by and through both

13  means of communication.

14      96.    Upon obtaining the loan facility from GemCap, Western submitted

15  Borrowing Certificates to GemCap from February 4, 2013 to July 2, 2013 that were

16  in furtherance of the RICO conspiracy.  These Borrowing Certificates reported

17  collateral substantially in excess of what the company actually had in its possession,

18  which caused significant overadvances to Western.  The Borrowing Certificates

19  were submitted by Brown and Dargan predominantly, and were delivered to

20  GemCap, by e-mail and United States mail.

21      97.    As a result of Defendants' fraudulent misrepresentations inducing the

22  loan, and the fraudulent Borrowing Certificates, GemCap approved the Western

23  loan facility in January 2013 and advanced Western approximately $4 million in

24  loan funds. Although GemCap cannot know with certainty, it is informed and

25  believes that Western's true financial condition would have precluded it from

26  receiving much, if not all, of these advances.  In short, Western received

27  overadvances that are certainly in excess of $1 million, and more likely substantially

28  greater than that.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

98.     Upon discovery of Western's overstated collateral reporting and the resulting overadvances, GemCap performed an audit and investigation of Western's operations, which revealed that Western appeared to have systematically removed collateral from its three facilities in California, Nevada and Texas in violation of myriad provisions of the Loan Agreement and in an obvious effort to frustrate GemCap's rights to secure and liquidate that collateral.

99.     GemCap is informed and believes, and on that basis alleges, that the Defendants have engaged in both mail and wire fraud in conspiring to defraud GemCap in the manner alleged above. Both mail and wire fraud are predicate acts under RICO, and serve to support GemCap's claim for relief under the statute.

100.     GemCap, as a result of the Defendants' misconduct – including their mail and wire fraud – placed Western in default and demanded immediate repayment of the outstanding loan amount. GemCap also made demand on Mase, through the Guaranty. The Defendants have, despite GemCap's demand, failed and refused to fulfill their obligations to GemCap and have prevented GemCap from exercising its rights under the Loan Agreement to secure and liquidate the collateral. Were that not enough, GemCap has become aware that, since the Notice of Default was issued on July 9, 2013, the Defendants have continued selling pledged collateral, ever soliciting customers for cash payments. This ongoing misconduct is intended to frustrate GemCap's rights under the Agreement and prevent GemCap from realizing any proceeds from the sale of the pledged collateral.

101.     As a direct and proximate result of Defendants' RICO violations, GemCap has incurred damages and will continue to incur damages in an amount to be proven at trial.

102.     Under RICO, GemCap is also entitled to recover threefold the damages it sustains and its costs of suit, including attorneys' fees.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## SECOND CLAIM FOR RELIEF

### (Breach of Loan Agreement Against All Defendants

### Except CFO911 And Dargan)

103.   GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 101 as though fully set forth herein.

104.   GemCap entered into the Agreement with Western, which was accompanied by a Loan Schedule (Exs. 1 and 3 respectively).  The parties later executed an Amendment to the Loan Agreement on April 26, 2013 (Ex. 2).

105.   GemCap performed all of its obligations, or substantially all of its obligations, that the Loan Agreement required of GemCap to do except for those obligations GemCap was excused from having to perform.

106.   Western breached the Loan Agreement by, among other things and without limitation:

        a.      Failing to maintain the amount of certified collateral on hand.

        b.      Failing to provide accurate Borrowing Certificates, which resulted in overadvances.

        c.      Using loan proceeds for unauthorized purposes.

        d.      Failing to maintain and preserve collateral and records.

        e.      Refusing and blocking GemCap from having access to the collateral.

        f.      Otherwise failing to repay amounts due despite demand from GemCap.

107.   As a direct and proximate result of defendants' breach of the Loan Agreement, GemCap has incurred not less than $6,029,642.01 in damages and will continue to incur damages in an amount to be proven at trial, in addition to incidental and consequential damages and attorneys' fees and costs.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## THIRD CLAIM FOR RELIEF

### (Breach of Validity Guaranty Against Mase)

108.    GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 106 as though fully set forth herein.

109.    GemCap entered into the Guaranty with Mase (Ex. 4), by which Mase personally guaranteed Western's obligations under the Loan Agreement.

110.    Mase reaffirmed and ratified his obligations as guarantor with respect to the Loan Agreement and the Amendment thereto in a letter agreement dated April 26, 2013 (Ex. 5).

111.    Western defaulted on its obligations under the Loan Agreement, which caused significant losses to GemCap.  Under the terms of the Guaranty, Mase was obligated to fully and promptly make payment to GemCap and satisfy and perform any and all other obligations of Western under the Loan Agreement.

112.    Mase breached the Guaranty by failing to fulfill his obligations thereunder, as he has not made any payment to GemCap nor has he satisfied or performed any of Western's other obligations.

113.    As a direct and proximate result of Mase's breach of the Guaranty, GemCap has incurred not less than $6,029,642.01 in damages and will continue to incur damages in an amount to be proven at trial, in addition to incidental and consequential damages and attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF

### (Fraud Against All Defendants)

114.    GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 112 as though fully set forth herein.

115.    As part of its inducement to GemCap in January 2013 to issue the requested loan facility, the Defendants – and Mase in particular – represented that: (1) Western had sufficient collateral to support the loan facility; (2) Western would be an ongoing business independent of TLD/Vega and would not utilize the same

1  management team of style as TLD/Vega; (3) Western would submit authentic and

2  truthful Borrowing Certificates during the pendency of the facility that accurately

3  depicted Western's "eligible" collateral; (4) Western would preserve and protect the

4  pledged collateral, as required under the Agreement; and (5) Ernst would play no

5  role in the management of Western.  GemCap, reasonably relying on those

6  representations, extended the loan facility to Western, as evidenced by the

7  Agreement and accompanying loan documents.

8       116.   The Defendants' representations – and Mase's in particular – were

9  knowingly false at the time they were made.  The true facts were that: (1) Western

10  lacked the collateral or ability to support the loan facility it was seeking from

11  GemCap; (2) Western was in truth little more than a continuation of TLD/Vega, and

12  merely the next corporate artifice that Mase and Ernst constructed to channel their

13  fraudulent loan scheme; (3) the Defendants had no intent to fulfill their obligations

14  under the Agreement, and in particular went on to submit a long series of false

15  Borrowing Certificates that inflated the "eligible" collateral that Western held; and

16  (4) the Defendants had no intention of preserving and protecting the pledged

17  collateral, and instead proceeded the waste, transfer, disperse, and/or dispose of it;

18  and (5) the Defendants had no intention of excluding Ernst from Western's

19  management, and he in fact was intimately involved in the day-to-day operations of

20  the business.

21       117.   GemCap would not have entered into the Loan Agreement with

22  Western and continued to extend credit to Western without said reliance.  And, as

23  alleged above, the Defendants furthered the fraud by knowingly and intentionally

24  submitting Borrower Certificates to GemCap that misrepresented the status of

25  Western's collateral.  GemCap extended further credit to Western in reliance on

26  those representations, resulting in overadvances.

27       118.   GemCap's reliance on the false representations made by defendants

28  during the negotiations for the loan facility and the false representations made by

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  defendants in the subsequent Borrowing Certificates was the proximate cause of

2  GemCap's damages.

3      119.  As a legal and proximate result of the fraudulent conduct by

4  Defendants, and each of them, GemCap has incurred damages and will continue to

5  incur damages in an amount to be proven at trial.

6      120.  In performing the acts alleged herein, Defendants, and each of them,

7  have acted fraudulently, despicably, and in willful and conscious disregard of

8  GemCap's rights, thereby justifying an award of punitive and exemplary damages

9  against defendants.

10  <u>**FIFTH CLAIM FOR RELIEF**</u>

11  **(Negligence Against Brown, Mace and Fainsbert)**

12      121.  GemCap realleges and incorporates the allegations set forth in

13  paragraphs 1 through 119 as though fully set forth herein.

14      122.  Brown, Mase and their firm, Fainsbert, issued opinions to GemCap

15  during the initial negotiations for the Western loan facility, as well as during the

16  subsequent negotiations to modify its terms, all of which were intended to influence

17  GemCap to lend money to their client, Western.  As detailed above, these opinions

18  were comprised of numerous material misrepresentations.

19      123.  Additionally, Brown, who was serving as counsel to Western, signed

20  all of the Borrowing Certificates between February 1 and 5, 2013, which

21  misrepresented the status of Western's collateral and reasonably induced GemCap to

22  advance funds under the terms of the loan facility.

23      124.  Under California law, such opinions must be issued with due care, or

24  the attorneys who do not act carefully will have breached a duty owed to those they

25  attempted or expected to influence on behalf of their clients.

26      125.  Brown, Mase and the Fainsbert firm breached the duties owed to

27  GemCap by making these false and misleading representations for the monetary

28  benefit of Western.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    126.    As a legal and proximate result of Brown, Mase and the Fainsbert

2    firm's breaches, GemCap has incurred damages and will continue to incur damages

3    in an amount to be proven at trial.

### SIXTH CLAIM FOR NEGLIGENCE

### (Negligence Against CFO911 and Dargan)

6    127.    GemCap realleges and incorporates the allegations set forth in

7    paragraphs 1 through 125 as though fully set forth herein.

8    128.    CFO911 and its principal, Dargan, entered into an Engagement

9    Agreement with Western dated February 5, 2013, whereby Dargan agreed to act as

10    Western's temporary president until Mase could hire a permanent president.

11    129.    As Western's acting president, Dargan interfaced with GemCap on

12    matters associated with the Loan Agreement, including the submission of

13    Borrowing Certificates.

14    130.    As Western's acting president, Dargan owed a duty to GemCap to use

15    due care in managing Western's operations so that it fulfilled its obligations to

16    GemCap under the Loan Agreement.

17    131.    Dargan breached that duty by:

18        a.    Submitting Borrowing Certificates to GemCap that materially

19    misrepresented the status of Western's collateral.

20        b.    Failing to preserve Western's collateral and the proceeds

21    thereform.

22        c.    Refusing GemCap access to Western's records and collateral.

23        d.    Otherwise failing to see that Western fulfilled its obligations

24    under the Agreement.

25        e.    Executing the April 26, 2013 Amendment to the Agreement, and

26    representing – as part of that Amendment – that no defaults under the Agreement

27    has occurred or were occurring, a representation he now admits was false.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

132.   As a legal and proximate result of Dargan's breaches, GemCap has incurred damages and will continue to incur damages in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### (Conversion Against All Defendants Except CFO911 and Dargan)

133.   GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 131 as though fully set forth herein.

134.   Under the terms and conditions of the Agreement, GemCap has a right to possess Western's collateral and the proceeds therefrom.

135.   Defendants have wrongfully exercised control over the collateral and proceeds and converted same by transferring and liquidating the collateral for their own personal gain.

136.   GemCap has demanded immediate access to the collateral and proceeds, but the Defendants have failed and refused those demands and Defendants continue to assert sole and exclusive possession and control over the collateral and proceeds that belong to GemCap.

137.   As a legal and proximate result of defendants conversion, GemCap has suffered damages in an amount unknown at this time.  GemCap will establish its exact damages according to proof at the time of trial.

138.   Because the collateral and proceeds converted by Defendants may have grown far greater than the legal rate of interest recognizes and allowing Defendants to pocket the difference would reward them for their wrongdoing, GemCap is entitled to a constructive trust on the collateral and proceeds converted by defendants and any product or profit derived therefrom.

139.   In performing the acts alleged herein, Defendants, and each of them, have acted fraudulently, despicably, and in willful and conscious disregard of GemCap's rights, thereby justifying an award of punitive and exemplary damages against Defendants.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## EIGHTH CLAIM FOR RELIEF

### (Money Had and Received Against All Defendants Except CFO911 and Dargan)

140.   GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 138 as though fully set forth herein.

141.   GemCap has loaned and overadvanced the defendants, and each of them, not less than $6,029,642.01 as a result of the defendants' actions and misrepresentations.

142.   Defendants, and each of them, are therefore indebted to GemCap in the sum of not less than $6,029,642.01 for money had and received by each of the defendants.

## NINTH CLAIM FOR RELIEF

### (Unfair Business Practices Against All Defendants Except CFO911 and Dargan)

143.   GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 141 as though fully set forth herein.

144.   California Business and Professions Code § 17200 provides:

> As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

145.   Defendants have engaged in unfair business acts and practices within the meaning of California Business and Professions Code § 17200.  As alleged above, these unfair business practices and acts include, but are not limited to:  (1) Defendants' misrepresentations to GemCap; (2) Defendants' misappropriation and misuse of loan funds, and (3) Defendants' fraudulent breaches of the Loan Agreement.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

146.  As a direct, proximate, and foreseeable result of the wrongful conduct of Defendants, and each of them, including the misrepresentations, misappropriation and misuse of loan funds, and fraudulent breaches of the Loan Agreement, GemCap has been damaged in an amount to be proven at trial.  GemCap is entitled to relief, including full restitution and/or disgorgement of any funds and benefits that may be obtained by Defendants as result of such unfair business acts and practices.

147.  California Business and Professions Code § 17203 provides, in relevant part:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

148.  Pursuant to California Business and Professions Code § 17203, GemCap seeks an order of this Court for a temporary restraining order, preliminary injunction and permanent injunction:  (1) attaching Western's assets, whether in the possession of Western or any of the other Defendants, in the amount $6,029,642.01 plus applicable interest; (2) freezing all accounts in the name of Western, and enjoining and prohibiting Defendants from withdrawing, transferring, or otherwise dissipating any of the funds in those accounts; (3) freezing all accounts in the name of Amalfi, and enjoining and prohibiting Defendants from withdrawing, transferring, or otherwise dissipating any of the funds in those accounts; (4) freezing all accounts in the name of Athlone, and enjoining and prohibiting Defendants from withdrawing, transferring, or otherwise dissipating any of the funds in those accounts; (5) freezing all accounts in the name of the Mase controlled entities that were used as part of the fraudulent scheme, and specifically Jefferson, ACG, Amalfi JDM, MJR, Pacific, SF and Quadrelle, and enjoining and prohibiting Defendants

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

from withdrawing, transferring, or otherwise dissipating any of the funds in those accounts; (6) enjoining and prohibiting the transfer of any funds, collateral or other assets by and between any of the Defendants; (7) enjoining and prohibiting all of the Defendants from taking any steps to frustrate, impair or prevent GemCap from attaching or seizing any of the pledged security under the Agreement and its related documents; (8) enjoining and prohibiting all of the Defendants from taking any steps that could or will impair GemCap's rights under the Agreement and related documents, including without limitation its right the pledged security; and (9) enjoining and prohibiting all of the Defendants from preventing GemCap from exercising its rights under the Loan Agreement to inspect the loan collateral and/or from inspecting the books and records of Western.

## TENTH CLAIM FOR RELIEF

### (Injunctive Relief Against All Defendants Except CFO911 and Dargan)

149.   GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 147 as though fully set forth herein.

150.   If injunctive relief is not granted, there is a substantial danger that Defendants will dissipate, waste, sell, transfer, hide, and/or conceal their assets and/or place them beyond the reach of GemCap so that they may never be recovered.

151.   GemCap therefore seeks an order of this Court for a temporary restraining order, preliminary injunction and permanent injunction:  (1) attaching Western's assets, whether in the possession of Western or any of the other Defendants, in the amount $6,029,642.01 plus applicable interest; (2) freezing all accounts in the name of Western, and enjoining and prohibiting Defendants from withdrawing, transferring, or otherwise dissipating any of the funds in those accounts; (3) freezing all accounts in the name of Amalfi, and enjoining and prohibiting Defendants from withdrawing, transferring, or otherwise dissipating any of the funds in those accounts; (4) freezing all accounts in the name of Athlone, and

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  enjoining and prohibiting Defendants from withdrawing, transferring, or otherwise

2  dissipating any of the funds in those accounts; (5) freezing all accounts in the name

3  of the Mase controlled entities that were used as part of the fraudulent scheme, and

4  specifically Jefferson, ACG, Amalfi JDM, MJR, Pacific, SF and Quadrelle, and

5  enjoining and prohibiting Defendants from withdrawing, transferring, or otherwise

6  dissipating any of the funds in those accounts; (6) enjoining and prohibiting the

7  transfer of any funds, collateral or other assets by and between any of the

8  Defendants; (7) enjoining and prohibiting all of the Defendants from taking any

9  steps to frustrate, impair or prevent GemCap from attaching or seizing any of the

10 pledged security under the Agreement and its related documents; (8) enjoining and

11 prohibiting all of the Defendants from taking any steps that could or will impair

12 GemCap's rights under the Agreement and related documents, including without

13 limitation its right the pledged security; and (9) enjoining and prohibiting all of the

14 Defendants from preventing GemCap from exercising its rights under the Loan

15 Agreement to inspect the loan collateral and/or from inspecting the books and

16 records of Western.

17                          **PRAYER FOR RELIEF**

18       WHEREFORE, GemCap prays for judgment as follows:

19 **On the First Claim for Civil RICO Violations:**

20       1.     For damages according to proof;

21       2.     For treble damages;

22       3.     For attorneys' fees and costs as allowed by law;

23 **On the Second Claim for Breach of the Loan Agreement:**

24       4.     For damages according to proof, but at least $6,029,642.01;

25       5.     For attorneys' fees and costs as allowed by law;

26 **On the Third Claim for Breach of the Guaranty:**

27       6.     For damages according to proof, but at least $6,029,642.01;

28       7.     For attorneys' fees and costs as allowed by law;

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**On the Fourth Claim for Fraud:**

    8.    For damages according to proof;

    9.    For punitive and exemplary damages according to proof;

**On the Fifth Claim for Negligence:**

    10.    For damages according to proof;

**On the Sixth Claim for Negligence:**

    11.    For damages according to proof;

**On the Seventh Claim for Conversion:**

    12.    For damages according to proof;

    13.    For a constructive trust;

    14.    For punitive and exemplary damages according to proof;

**On the Eighth Claim for Money Had and Received:**

    15.    For damages according to proof, but at least $6,029,642.01;

**On the Ninth Claim for Unfair Business Practices:**

    16.    For restitution and disgorgement;

    17.    For a writ of attachment against Western in the amount $6,029,642.01 plus applicable interest;

    18.    For a temporary restraining order, preliminary injunction and permanent injunction;

**On the Tenth Claim for Injunctive Relief:**

    19.    For a writ of attachment against Western in the amount $6,029,642.01 plus applicable interest;

    20.    For a temporary restraining order, preliminary injunction and permanent injunction;

**On All Claims for Relief:**

    21.    For prejudgment and postjudgment interest as allowed by law;

    22.    For costs of suit incurred herein; and

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

23.    For such other and further relief as the Court may deem just and proper.

DATED: September 19, 2013          FREEMAN, FREEMAN & SMILEY, LLP


By: _____
     TODD M LANDER
     JOHN VAN ACKEREN
     Attorneys for GEMCAP LENDING I, LLC

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## JURY TRIAL DEMAND

Plaintiff GemCap Lending, I, LLC hereby demands trial by jury.

DATED: September 19, 2013              FREEMAN, FREEMAN & SMILEY, LLP

By: _____
    TODD M LANDER
    JOHN VAN ACKEREN
    Attorneys for GEMCAP LENDING I, LLC

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100